Chicago and Western Indiana Railroad Company *et al.*

*v.*

Eugene M. Dunbar *et al.*

*Filed at Mt. Vernon Sept. 4, 1880—Rehearing denied Sept. 30, 1881.*

1. RAILROAD—*of its location and construction in a city—assent of the
city—rights and powers of the company.* A railroad company organized
under the general law of March 1, 1872, has authority to select its own

route, to lay out its road and to construct the same; and this power, by necessary implication, carries with it the power of fixing the terminal points of the proposed road, subject only to the limitation that the *construction* of its road upon or across any street in any city must be with the assent of the corporation of such city.

2. A railroad company, as a general rule, may select its own route, fix its terminal points, and lay out its road and acquire the right of way and other property necessary for the construction of its road on any and every part of its line, whether within city limits or without them, according to its own discretion. The lines selected may, without the assent of the city, cross streets, and the company may, without such assent, acquire the right of way and construct its road on every part of such line, except the parts to be constructed upon or across streets.

3. Under the present legislation, it is not necessary, as a condition precedent to the location of its line within a city by a railroad company, or to the construction of its railroad within the city, or such parts of its lines as are not within any street, or to the power to condemn any private property within the city for such purpose, that any ordinance should be passed by the city council either giving assent for the construction of the road upon or across streets, or providing for the location of the road.

4. SAME—*sufficiency of ordinance for construction in city—omission to designate the precise route.* A city ordinance granting permission to a railroad company to construct and operate a railroad within the city limits, is not void because it fails to designate the precise line upon which the road may be constructed, and omits to designate the precise points at which the road may be constructed across and upon the several streets to be intersected by it.

5. Permission granted by a city council to a railroad company to construct its road across streets at any points to be selected by the company within a given district, is not a delegation to the company of powers which can only be exercised by the council, as the power to locate the line of the road is given by statute to the railroad company alone, and not to the city authorities. The city of Chicago has power to make provision for the location of a railroad within its limits, but no power to locate. That power is in the railroad company, subject to such provisions for the location as the city council may make.

6. SAME—*power of city council to provide for the location, is no limitation until exercised.* The mere existence of a power in a city council "to provide for the location, grade and crossings" of railroads within the city, and "to change the location, grade and crossings" of railroads, until exercised is no limitation upon the power of a railroad company to select its route and locate its road within the city.

7. SAME—*necessity of petition by adjacent owners.* The clause in the City act that "the city council shall have no power to grant the use of or the

right to lay down any railroad tracks in any street" of the city, "except upon petitions of the owners of the lands representing more than one-half of the frontage of the street, or so much thereof as is sought to be used for railroad purposes," has reference only to cases where the city may propose to grant the privilege to a railroad company to run along a street for a given distance, and not to a case where the road merely crosses a street.

8.   SAME—*requirement that other companies shall be permitted to use the track.* A provision in a city ordinance that the permission to construct a railroad within the city is upon condition that the railroad company shall permit any other railroad companies, not exceeding two in number, which have not then the right of entrance into the city, to use the main track of the road therein authorized to be laid, *jointly* with such road so authorized, does not render the ordinance invalid, as it confers upon the railroad company no power not given it by law, nor does it deprive the city of any power whatever.

9.   EMINENT DOMAIN—*property condemned must be necessary.*   The law authorizing the condemnation of private property for railroad purposes, is limited to such property as is necessary for the purpose in question, and no condemnation proceedings can lawfully be had of property not necessary for the construction or use of the road.  But this necessity need not be made certain before it is lawful to proceed with the condemnation.

. 10.   STATUTE—*general Railroad act of 1849 is repealed.*   The provision of the general Railroad act of 1849, prohibiting railroads from entering cities without municipal consent, if not repealed by implication by the act of 1872, is wholly so by the act of March 31, 1874.

AGREED CASE from the Superior Court of Cook county; the Hon. JOHN A. JAMESON, Judge, presiding.

The following are the facts shown in the record in this case: On the 4th of June, 1879, the Chicago and Western Indiana Railroad Company was duly organized under the general law of this State in force July 1, 1872, which provides for the incorporation of such corporations, and defines their powers.   (Rev. Stat. 799.)   The purpose and object of the corporation, as stated in articles of association, was to construct and operate a railroad, the line of which "will begin at a point on the boundary line between the States of Illinois and Indiana, in the south-easterly part of Thornton township, Cook county; thence through or near the town of Dalton to such terminus in the city of Chicago as may be selected by

said corporation,—all such line of railroad being in Cook county, Illinois."

On the 15th of September, 1879, the city council, at the request of said corporation, adopted an ordinance, of which the following is a copy:

"*Be it ordained by the City Council of the City of Chicago:*

"SECTION 1.    That permission and authority be and the same is hereby given and granted to the Chicago and Western Indiana Railroad Company to lay down, maintain and operate a railroad, with one or more tracks, and such switches, sidings and turn-outs as may be necessary, along and upon the following route in the city of Chicago, to-wit:    Commencing at the southern boundary line of the city of Chicago, at some point within one hundred feet of the west line of Stewart avenue, and thence northwardly over such lots, lands and property as the said company now owns or hereafter may acquire, by lease, purchase, condemnation or otherwise, parallel to said Stewart avenue, to the intersection of Grove street and said Stewart avenue, and thence over and upon such lots, lands and property as the said company now owns or hereafter may acquire, by lease, purchase, condemnation or otherwise, unto such terminus as it may establish between the east bank of the south branch of the Chicago river and the west side of State street, and between Sixteenth street and the south line of Van Buren street, in said city.

"Sec. 2.    The said railroad company may cross any and all intervening streets, alleys and railroad tracks upon or along the line of the said route, as designated in the first section, said company to be subject at all times to the direction of the department of public works, or other proper department or officer of said city, in the construction of its said tracks, in making the crossings or connections with other roads, and the keeping in repair of so much of said streets, alleys and crossings as may be occupied by said railroad company with its tracks, switches and turn-outs.

8—100 ILL. .

"Sec. 3.   The said railroad company may, and it is hereby authorized to, lay down, maintain and operate one or more railroad tracks, with such turn-outs, side-tracks and switches as it shall deem necessary, over and across any land which it may acquire upon the line of said route, by lease, purchase, condemnation or otherwise; and the said railroad company may use and operate the railroad tracks hereby authorized to be laid, with locomotive engines and cars, subject to all ordinances of the city of Chicago applicable to railroads which are now or hereafter may be in force.

"Sec. 4.   The permission, authority and privileges hereby granted are upon the express condition that the said railroad company shall erect and maintain viaducts over any of its said tracks, on any street or streets of said city which may be crossed by its said tracks, where and as the said city council may from time to time require, and under the supervision of the department of public works, or other proper department or officer of said city, and erect and construct the approaches to all such viaducts, with proper areas on either side of such approaches: *Provided, however*, that where any such viaduct can not be built at any such street crossing without the same be built over the track or tracks of some other railroad company or companies, then the said Chicago and Western Indiana Railroad Company shall only be obliged to join with such other last mentioned railroad company or companies in the construction and maintenance of such viaduct, and to pay their fair proportion of such viaduct or viaducts; and if such other railroad company or companies shall not join in the erection of any such viaduct, then, when the proportion of such other company or companies shall be otherwise provided, the said Chicago and Western Indiana Railroad Company shall pay its fair proportion of the cost of any such viaduct.

"Sec. 5.   The said railroad company shall be subject to all general laws and ordinances of the city of Chicago in

relation to railroads, which are now or may hereafter be in force.

"Sec. 6. The permission and authority hereby granted are upon the further express condition, that the said railroad company shall and will forever indemnify and save harmless the city of Chicago against and from any and all damages, judgments, decrees and costs and expenses of the same which it may suffer, or which may be recovered or obtained against said city, for or by reason of the granting of such privileges and authority, or for or by reason of, or growing out of or resulting from, the passage of the ordinance, or any matter or thing connected therewith, or with the exercise by said company of the privileges hereby granted, or from any act or acts of the said company under or by virtue of the provisions of this ordinance.

"Sec. 7. The permission and authority herein granted are upon the further express condition, to-wit: That said railway°company shall permit any corporation, person or persons, duly authorized by ordinance of said city, to construct side-tracks to intersect any track or tracks of said railroad company within the limits of said city, for the purpose of conveying property to and from such railroad to any warehouse, lumber yard, coal yard, or any manufactory situated within one thousand feet of said railroad; and upon reasonable compensation being made therefor, shall, at all times, permit the owners or lessees of any such side-track, or the consignees of any property, to take the cars containing such property to him or them consigned, to any such warehouse, lumber yard, coal yard or manufactory, situated upon any such side track: *Provided, however,* that any cars so taken shall be returned without any unnecessary delay, and that any such owner, lessee or person conducting or carrying on any such warehouse, lumber yard, coal yard or manufactory, shall be entitled to have any property taken from any such warehouse, lumber yard, coal yard or manufactory, over any such side-

track, to and upon the tracks of said railroad, under the directions and regulations, to said railroad company, without unreasonable delay : *And provided further*, that the privileges authorized herein are granted upon the express condition that the Chicago and Western Indiana Railroad Company shall permit any other railroad companies, not exceeding two in number, which have not at present any right of entrance into the city of Chicago under any existing ordinance, to use the said main railroad tracks herein authorized to be laid jointly with the said Chicago and Western Indiana Railroad Company, upon such fair and equitable terms as may be agreed upon by said companies ; and in event that said companies can not agree upon such terms, the same shall be settled by three disinterested persons, one to be selected by said Chicago and Western Indiana Railroad Company, one to be named by such other company as may desire to use said tracks, and the third by said two persons, and the terms and conditions which shall be fixed and determined by said persons, or a majority of them, shall be the terms and conditions upon which said companies, respectively, shall use and occupy said tracks ; and upon the further express conditions that said Chicago and Western Indiana Railroad Company, and any other railroad company or companies that shall construct or operate said railroad under this ordinance, or under lease from or contract with the said Chicago and Western Indiana Railroad Company, shall be held jointly bound to pay all legal damages that may accrue to the owners of property by reason of the construction or operation of said railroad under the ordinance.

"Sec. 8.   The privilege and authority hereby granted are so granted upon the further express condition that the tracks authorized by this ordinance shall be laid down and constructed within one year from the passage of this ordinance ; and if not so constructed and in operation, all the rights and

privileges granted by this ordinance to such company shall cease, and be null and void.

"Sec. 9.    This ordinance shall be in force from and after its passage."

This ordinance was passed without any previous petition by the owners of property fronting upon any of the streets or alleys intersected or to be intersected by the line of said railroad, asking that the consent of the city should be given to the railroad company to lay down its tracks over or across any of such streets or alleys.

Before the adoption of this ordinance, the railroad company had located and surveyed its line from the point on the State line to a point on the south boundary of the city of Chicago, and had selected a contemplated line in the city, within the bounds named in the ordinance, and had purchased large amounts of lots and lands on and near its proposed line. After the passage of the ordinance, and before the filing of the bill in this case, the railroad company had fixed its northern terminus on the south side of Van Buren street, between State street and Dearborn, and had surveyed and located its main line from the south boundary of the city of Chicago, running northward, immediately west of and adjoining the western line of Stewart avenue, a distance of about two and one-half miles, to the intersection of Grove street, and there crossing Stewart avenue and Grove street diagonally in a more easterly direction, and thence in a north-easterly direction between Grove street and the south branch of the Chicago river, crossing Eighteenth street and Sixteenth street, and intersecting Clark street near the crossing of the Chicago, Burlington and Quincy railroad, and Dearborn street at the intersection of that street and Fifteenth street, thence nearly due north to Twelfth street; and before the filing of the bill this railroad company had acquired title (chiefly by purchase) to all the private property on which its main tracks are located, from the south boundary of the city northward to

Grove street, embracing a strip of such property lying next west of Stewart avenue, for the whole of that distance, at least forty-eight feet wide in every part thereof, and in other parts wider; and had acquired title to large portions of property along its line between Stewart avenue and Twelfth street; and had become the owner of the lots adjoining the streets on both sides thereof, at every point where such line intersects a street, in its whole course, from the south boundary of the city to the south side of Twelfth street, on its line. In addition, the corporation had bought large amounts of real estate north of Twelfth street and south of Van Buren street, on or near the route of its proposed line, to its northern terminus, on the south side of Van Buren street and between Dearborn and State streets.

This corporation had also constructed its road from the south boundary of the city to the intersection of Archer avenue, and had there established a passenger station, and had constructed on its own land, and adjoining its tracks, at a point next south of Thirty-third street, an engine house, turn-table and repair shop, and constructed a yard, with side-tracks and switches, and had constructed a considerable portion of its track as far north as Twelfth street, and near Twelfth street had built a large and expensive freight depot, and for a time had had its road in actual operation as far north as Archer avenue, running four trains daily thereon, carrying passengers, freight and the United States mail; and in all this had expended, before the filing of this bill, more than one million of dollars within the city of Chicago.

The Chicago and Western Indiana Railroad Company, before the filing of the bill, had made with the Chicago and Eastern Illinois Railroad Company a contract of perpetual lease and user of its track, from the point of junction of the two railroads, at a point about twenty miles south of Chicago, to and into the city of Chicago; and that company was, before the

bill was filed, running daily trains on the line as far north as Archer avenue, and had made arrangements to run its freight trains to the depot on Twelfth street, and its passenger trains to the proposed terminus on Van Buren street, as soon as the road can be put in readiness for that purpose.

One of the appellees (Dunbar) owns a lot on Thirty-seventh street, about twenty-four feet wide and perhaps one hundred and fifty feet long, lying adjoining and next west of the ground on which the railroad track is built, and about two blocks north of the south boundary of the city. The other appellee (Valentine) owns a lot of about the same size, lying just south of Thirty-eighth street, and from seventy-five to one hundred feet from and west of the line of the railroad track, and about one block from the south boundary of the city.

This is a bill by complainants, Dunbar and Valentine, charging that the Chicago and Western Indiana Railroad Company have begun proceedings in the county court of Cook county, under the eminent domain laws, to condemn the lot of Dunbar for the use of the railroad company, and that the operation of the railroad in the vicinity of Valentine's lot will damage the use and value thereof by the casting of smoke, ashes and cinders upon it from passing engines, and by the noise of engines and trains, and will obstruct the free passage to and from the front of his lot on Thirty-eighth street; and they join in asking an injunction to restrain the said railroad company from proceeding farther in the construction of its road, and restraining both railroad companies from operating the same, and forbidding the first railroad company to move farther in the proceeding in condemnation of the property of Dunbar.

The Superior Court of Cook county heard the case upon bill and answer, and, contrary to his view of the law, as expressed at the time by the then presiding judge, entered a decree *pro forma*, that said ordinance is illegal and void upon its face;

that said ordinance is also illegal and void because no petition of property owners was filed prior to its passage; that the passage of a valid ordinance locating the precise route of the railroad, and consenting to the crossing of the streets and alleys upon such route, is a condition precedent to the exercise by the railroad company of the power of eminent domain to acquire private property within the city; that in the absence of such an ordinance, a court of chancery has the power to enjoin the prosecution of condemnation proceedings; that the actual location and construction of the railroad within the city of Chicago, under the ordinance in question and under the circumstances detailed in the answers, is not a valid location of said line of railroad; that the complainant has the right to relief in a court of equity against the acts of the defendant complained of in the bill; and in pursuance of the said decision, the court ordered, adjudged and decreed that the injunction theretofore granted, prohibiting the Chicago and Western Indiana Railroad Company from proceeding to finish and operate its railroad within the city of Chicago, and from proceeding further in the proceedings begun for the condemnation of the land of Dunbar, should be made perpetual.

Messrs. Lawrence, Campbell & Lawrence, and Mr. Henry Crawford, for the railway company, after stating the facts and questions in the case, made the following among various other points:

The nature of the corporate power to locate or select the route of a railroad has been frequently under discussion in this and other courts, and with entire unanimity the decisions announce the doctrine that such discretion, when expressly delegated by the General Assembly, and not wantonly exercised, is conclusive, and not subject to review; citing *Park's Appeal,* 64 Pa. St. 141; *Boston and Providence Railroad Co.* v. *Midland Railroad Co.* 1 Gray, 364; *Spring* v. *Connecticut River Railroad Co.* 4 Cush. 69; *South River Rail-*

*road Co.* v. *Stoddard,* 6 Minn. 150; *N. Y. and H. Railroad Co.* v. *Kip,* 46 N. Y. 553; *Stock and Dar. R. C.* v. *Brown,* 9 Hoff. L. 255; *Illinois Central Railroad* v. *Rucker,* 14 Ill. 153; *Chicago, Burlington and Quincy Railroad Co.* v. *Wilson,* 17 id. 123; *Chicago, Rock Island and Pacific Railroad Co.* v. *Joliet,* 79 id. 35; *Same* v. *Town of Lake,* 71 id. 337; *Dunham* v. *Hyde Park,* 75 id. 374; *Boston* v. *Walhen,* 60 id. 138; *St. Louis, J. and C. Railroad Co.* v. *Mather,* 71 id. 592; *Marsh* v. *F. P. and N. W. Railroad Co.* 64 id. 461.

The power to construct a railway across, along, or upon the streets of a city, is subject to but two restrictions by the general Railroad act:

*First*—"The corporation shall restore the street thus intersected to its former state, or to such a state as not unnecessarily to leave impaired its usefulness, and keep such crossing in repair."

*Second*—"The assent of the corporation of such city, town, or village."

The first is a condition subsequent, and the latter a condition precedent, to the exercise of the power to lay tracks, either across or lengthwise upon the street; but the manner in which this municipal assent is to be expressed is not designated in this nor in the City act.

It is clear that the proviso in the 5th item of section 19 has exclusive reference to the assent of the city as the owner of the streets, and not to any act done in its legislative capacity; citing *Moses* v. *Pittsburg, Ft. Wayne, etc. Railroad Co.* 21 Ill. 522; *C. C. R. W. Co.* v. *The People,* 73 id. 533; *W. D. Ry. Co.* v. *Met. Ry. Co.* 87 id. 317; *The People* v. *Gas Light Co.* 38 Mich. 154.

That a grant of the right of way over private property may be lawfully made before the road is located, and without specifying the exact route, has been repeatedly adjudged; citing *Morris* v. *Illinois, Bloomington and Western Railway Co.* 76 Ill. 522; *Ross* v. *Chicago, Burlington and Quincy Railroad*

*Co.* 77 id. 135; *Conwell* v. *Railroad Co.* 81 id. 234; *Munkers* v. *Kansas City, etc. Railroad Co.* 60 Mo. 338; *Leavenworth Railroad Co.* v. *United States,* 2 Otto, 741.

An ordinance should receive a reasonable construction, so as to make the same valid, if it can be done. 1 Dillon on Mun. Corp. sec. 353; *Whitlock* v. *West,* 26 Conn. 409.

Where a discretionary power is conferred upon a municipal corporation, it follows that the judicial department can not annul the act done in the discretion of the body, nor substitute its own. 1 Dill. sec. 59; *Mayor* v. *B. and O. Railroad,* 21 Md. 92; *Com.* v. *Morristown,* 18 N. J. (Eq.) 305; *McCullough* v. *Maryland,* 4 Wheat. 316; *Covington* v. *East St. Louis,* 78 Ill. 552; *Chicago Packing Co.* v. *Chicago,* 88 id. 225; *North Cent. Railroad* v. *Baltimore,* 21 Md. 104.

Many city ordinances providing no location, except by giving choice within a reasonable area, have been sustained by this court. *Illinois Central Railroad* v. *Rucker,* 14 Ill. 353; *Moses* v. *Pittsburg, Ft. Wayne and Chicago Railroad,* 21 id. 516; *Murphy* v. *Chicago,* 29 id. 279; *Evans* v. *Chicago,* 24 id. 52; *Stetson* v. *C. and E. Railroad Co.* 75 id. 74; *Indianapolis, Bloomington and Western Railroad* v. *Hartley,* 67 id. 441; *Patterson* v. *C., D. and V. Railroad,* 75 id. 590.

It has been the universal method adopted in other States not to make any precise location of the route within cities, but leave the discretion to select the actual line to the company. *Tate* v. *Ohio and Mississippi Railroad Co.* 7 Ind. 479; *I. and C. Railroad Co.* v. *Lawrenceburg,* 37 id. 489; *Milburn* v. *C. R. R.* 12 Iowa, 246; *Slatten* v. *Des Moines,* 29 id. 148; *Mercer* v. *Pittsburg, Ft. Wayne and Chicago Railroad,* 36 Pa. St. 99; *Pacific Railroad* v. *Leavenworth,* 1 Dill. 393.

Mr. Albert H. Veeder, and Messrs. Dent & Black, for Dunbar and others, after stating the case and questions presented by the agreed statement of facts, made the following among other points in their printed argument:

That no railroad company organized under the general Railroad act of 1872 can have any authority or operate a road within the confines of a city organized under the act of 1872, until that city has legally provided for the location of that road within its limits, which provision can only be evidenced by some formal legislative enactment, passed by the city council, under the power and duty devolved upon it by paragraph 25 of section 62 of the general City act. (Hurd's Stat. 1877, p. 210.) And that no railroad corporation standing within a city as a mere unlawful intruder, without the legal power or right to construct its road within the city, can lawfully invoke the provisions of the Eminent Domain act for the condemnation and taking of private property.

It is necessary to constitute a valid ordinance in such a case, *first,* that it should definitely locate the route of the proposed road, and that any delegation of the power to locate such route to the company itself was an unauthorized delegation of power, and an abandonment of the duty devolving upon the common council, vitiating the ordinance; and, *second,* that as a condition precedent to the passage of any such ordinance, when it appeared on the face of the ordinance that various streets of the city, or parts of such streets, would have to be used in the construction of the proposed road, there should be a petition of the property owners, in pursuance of paragraph 90 of section 62 of the general City act.

The provisions of section 7 of the ordinance are illegal, and render the ordinance invalid. By it there is a grant, by necessary implication, not only to the railroad company in question, but to any other railroad company or companies with which it might make arrangements to construct and operate the road. It casts the obligation on the Chicago and Western Indiana Railroad Company to allow at least two other roads to use its tracks, with no limitation upon that company to restrain it from allowing the use of its tracks, not by two only, but by ten or a hundred companies. This

ordinance therefore embodied a grant that may be almost indefinitely extended. Is not this a plain violation of the trust committed to the city council?

It will be observed that this ordinance, by section 7, reserves no control to the city council. If the ordinance is valid, any number of such corporations may enter the city in defiance of the council and the· entire power of the city.

Mr. Charles H. Morse, also for Dunbar and others, among others made the following points:

The power of eminent domain must and does have its origin alone in the public necessity, and the measure of that necessity must be and is the measure of the power. Citing many acts of the legislature. ·

In every case in which a railway company formed under the general act of March 1, 1872, sues for the condemnation of any particular piece of land, the question whether such land is necessary or not for the construction and operation of the railway and its necessary accommodations, is a question for the courts to determine. *Reed* v. *Louisville Bridge Co.* 8 Bush, 69; *Hill* v. *Western Vermont Ry. Co.* 32 Vt. 68.

No land whatever can be condemned for the construction and use of any railroad, or 'its necessary accommodations, until the line of route over which such railway is to be constructed has been first located by some one invested with the authority of law for that purpose, nor until the width of such route, and the space to be occupied by such road, has been definitely fixed by some one lawfully authorized to perform that office. *Darlington* v. *United States*, 82 Pa. St. decided in 1876; *O'Hara* v. *Pennsylvania R. R. Co.* 1 Casey, 448; *Neal* v. *Pittsburg and Connellsville R. R. Co.* 4 id. 19.

With whom have the laws of Illinois lodged the power to locate the route, etc., of the Chicago and Western Indiana Railroad Company, or any other steam railway company formed under our general Railroad act, within the city of Chi-

cago? We answer, unhesitatingly and emphatically, with the city council of Chicago, and with that body alone. (General Railroad act in force March ·1,. 1872, and the act for the incorporation of cities, etc., approved April 10, 1872.)

Messrs. LEAMING & THOMPSON, on the same side:

The city council had no jurisdiction to pass the ordinance in question, for want of a petition of the property holders interested in the location of the road. *State* v. *Council of Elizabeth,* 30 N. J. (1 Vroom,) 176; Dillon on Mun. Corp. sec. 639; *Swift* v. *Williamsburg,* 24 Barb. 427; *Litchfield* v. *Vernon,* 41 N. Y. 123; *Holland* v. *Baltimore,* 11 Md. 186.

Mr. CHIEF JUSTICE DICKEY delivered the opinion of the Court :.

The decree in this case is clearly erroneous. Under the present laws of Illinois a railroad company organized under the general law of March 1, 1872, has express authority to select its own route, to lay out its road, and to *construct* the same. This power necessarily includes the power of fixing the terminal points of the proposed road. (Rev. Stat. 1874, p. 803, sec. 20.) This is made exceedingly clear when we read section 29 of that statute, wherein old companies (organized under the act of 1849, but whose terminal points had not been fixed by the General Assembly,) are authorized, if they adopt this act, to proceed thereunder and have all the benefits thereof. And it is declared that ."the fixing of the termini by any such corporation shall have the same effect as if fixed by the General Assembly." This necessarily implies that the benefits of this act carry with them the power to fix terminal points.

The power thus given is, however, subject to a limitation found in the fifth clause of section 20 of the act, wherein it is declared nothing in this act shall authorize "the *construction* of any railroad upon `or across any street in any city * * *

without the assent of the corporation of such city." This is the only limitation upon the powers of the railroad company, in this regard, found in *the Railroad act.* If there be no other limitation of this power by other statutes, it is obvious such a railroad company may, as a general rule, select its own route, fix its terminal points and lay out its road, and acquire the right of way and other property necessary for the construction of its road on any and every part of its line, whether within the city limits or without. them, according to its own discretion, for this limitation, by its terms, is confined to the *construction* of the railroad upon or across *streets.* The line *selected* may, without the assent of the city, cross streets, and the company may, without such assent and without violating this limitation, acquire the right of way and construct its road in such cases on every part of .such line, except the parts to be constructed upon or across streets. That part of the construction, and that alone, is, by *this limitation,* forbidden to be done without the assent of the city.

But it is suggested, that the mere existence of the power possessed by the city council of Chicago "to provide for the location, grade and crossings" of railroads within the city, and "to change the location, grade and crossings" of railroads, is a further limitation upon such power of the railroad company. It is not perceived how this can be so. Congress has power "to provide for organizing, arming and disciplining the militia," but in the absence of any law of Congress on that subject, State laws may be passed on that subject. The city possesses *the power* to act on this subject, but the mere existence of the power can have no effect unless it is exercised by the city. The city council has the power, by law, to regulate and control the use of landing places, wharfs, docks and levees; also, the anchorage, moorage and landing of all water craft and their cargoes within the city, and to make regulations in regard to the use of harbors; but it is not conceived that the mere possession of such powers by the city council,

in the absence of the exercise of the same, renders it unlawful for any one to use landing places, wharfs, docks or levees within the city, or makes it unlawful to use the harbor, anchor or moor vessels therein, or to land water craft or their cargoes. All these things may be done lawfully, so long as there is no ordinance forbidding the same. The city council also possesses the power "to direct the location" of packing houses, and breweries, and livery stables, and blacksmith shops; but it is not conceived that the mere existence of the power, so long as it is not exercised, renders it unlawful to erect and construct within the limits of the city such establishments. The power to interfere by such regulations and provisions, does not *of itself* constitute an interference. The statute has nowhere said, either expressly or by implication, that no livery stable or blacksmith shop shall be built in the city until the city council has exercised its power to direct the location thereof; nor has the statute, either expressly or by implication, said that no railroad shall be located or constructed within the city limits until the city council has exercised its power to provide for the location thereof. Let it be observed, the city council has no power (strictly speaking) to *locate* a railroad. That power is conferred upon the railroad company. The power of the city is to *provide* for the location of the railroad by the railroad company, for by law no one other than the railroad company has the power of location. That power is conferred on the railroad company alone, and not upon the city; but it must be exercised by the railroad company subject to such provision, if any, as the city council may lawfully make. The railroad company may, subject to such power in cities and villages, exercise by law all the powers granted by the Railroad act, and the only condition precedent found in the laws as they now stand, is, that the assent of the corporation of the city must be obtained before it may lawfully construct its road upon or across a public street in a city.

This has not always been the law in this State. By the general law of 1849 for the incorporation of railroad companies, such companies had not the power to effectively locate their line and fix their terminal points, or exercise the power of eminent domain, until the proposed route and termini were approved by the General Assembly. And it was provided in that statute, that nothing in that act should authorize the company to make "a location of their track within any city without the consent of the common council of such city." So long as that statute was in force, it would seem that such company could not lawfully locate any part of their line or construct the same within any city, or proceed to condemn private property for corporate purposes within any city, until the consent of the common council was first obtained. But this section of the act of 1849 is expressly repealed by the act of March 1, 1872, and in lieu of it we have the provision that such company shall not *construct* its "railroad upon or across any street in any city" without the assent of the city. There is no longer any prohibition (by statute) against locating the route *in any part* of the city. The prohibition is now confined to the use of streets, and all other parts of the city become open to the operations of the railroad company, until some provision limiting the same is made by the city council. There is no longer any prohibition against the *location* of the line, even across or upon streets. The present prohibition of the statute relates alone to the *construction* of the road upon or across streets. It is not for the courts to judge whether changes in the law, made by the General Assembly, are wise or unwise, beneficial or otherwise. It is enough that the law is changed. The act of 1872 in this regard differs from the act of 1849, not only in the form of its words, but in their scope and meaning. We are not at liberty to disregard a plain change in the law.

The law authorizing the condemnation of private property for railroad purposes is limited to such property as is neces-

sary for the purpose in question, and no condemnation proceedings can lawfully be had of property not necessary for the construction or use of the railroad; and it is most strenuously insisted that this necessity must be made certain before it is lawful to proceed with condemnation, and that it can not be made to appear that private property within a city will certainly be needed for the construction and use of the railroad company, until the consent of the corporation of the city has been lawfully obtained for the crossing of the streets, and that for that reason the passage of a valid ordinance in this regard is an essential condition precedent to the exercise of the power of condemning private property within the city by the railroad company. The law in no way provides the order in which the railroad company shall proceed in acquiring its right of way. The law does provide the mode in which this right of way may be acquired. Private property may be acquired by purchase or condemnation. (Secs. 18–20 of the Railroad act.) Land along highways, plank roads, turnpikes and canals can be obtained "by the consent of the lawful authorities having control or jurisdiction of the same, or by condemnation." (Sec. 20.) And the right of way for crossing or uniting with other railways may be acquired as provided in section 20, and the right of way upon or across streets in cities, incorporated towns or villages may be acquired by the assent of the corporation of such city, town or village. The law has provided one mode of acquiring the right of way across private property, and another mode of acquiring the right of way across streets, but the law has in no way provided the order in which the railroad company shall proceed in acquiring its right of way.

If the position of counsel in this regard be sound, it is difficult to perceive how a railroad company could ever proceed to condemn property on any part of its line. It must begin somewhere. And in the first proceedings to condemn, no matter on what part of the line, it might as well be urged

9—100 Ill.

by the owner of the property proposed to be taken in such case, that it did not appear that his property was necessary for the corporate purposes until the railroad company should have acquired the right of way on *all* other parts of the line, and the right to cross all streets of cities or of villages upon the proposed line, for the company might not succeed in getting the right of way elsewhere. It has been the usage of railroad companies in this State for many years, to proceed in their discretion, on the question of the right of way on certain parts of the line, without being required to acquire the right of way in any one part of the line before proceeding to acquire the right of way in another part of the line. In fact, it has been common to proceed in the matter of acquiring the right of way, by condemnation and otherwise, when only a part of the line had been located, and before the entire line had been located.

We are not aware that this position, or any position akin to it, was ever assumed, until taken in the case of *Metropolitan Railway Co.* v. *Chicago West Division Railway Co.* 87 Ill. 317. In that case it was insisted that the granting by the city council to the Metropolitan Railway Company of the privilege of using the street in question for railroad purposes, was an essential condition precedent to the right of that company to proceed with its condemnation of private property for corporate purposes, and it was there contended that the ordinance for that purpose, in that case, was invalid, because not legally enacted. This court there said : "The necessity for considering whether that ordinance (giving consent of common council) was legally enacted  *  *  *  is not perceived, so far as it can have any direct bearing on the decision of this case.  *  *  *  Obtaining the consent of the common council of the city for laying the track of the petitioner's railway in any given street, is not a condition precedent to condemning such property and interest or privilege as the defendant may have previously acquired, by contract

or otherwise, in such streets.   That consent may, with equal propriety, be obtained afterwards, and it is immaterial when it is secured."   And again it is said, the question of the legality of the ordinance "is not a question that in any degree affects petitioner's right to condemn the property of defendant, or any one else, for the purposes of its organization."

It would seem, then, that under the present law it is not necessary as a condition precedent to the location of its line within the city by a railroad company, or to the construction of its railroad within the city on such parts of its line *as are not within any street,* or to its power to condemn private property within the city necessary for such purpose, that any ordinance whatsoever should be passed by the city council, either giving assent for the construction of the railroad upon or across streets, or providing for the location of the railroad.   It is not necessary, however, in the decision of this case, that we should go to that extent in the construction of these statutes.   In this case the city council of the city of Chicago has passed an ordinance by which the assent of the corporation of the city is expressly given for the construction of this railroad across the streets intersected by its line as located, and also providing for the location of this railroad within the limits of the city; and it is not alleged that the location of the road is in any respect made in violation of the ordinance in question.

It is, however, insisted that this ordinance is void, because it fails to designate the precise line upon which the railroad may be constructed, and omits to designate the precise point at which the road may be constructed across and upon the several streets to be intersected by the railroad.   The statute nowhere, expressly or by any reasonable implication, requires such precise certainty.   The General Assembly has clothed the city council in general terms with power to provide for the location of railroads within the city, and with power to grant or refuse its assent to the construction of any railroad

upon or across streets within the city. The statute does not say how these powers, or either of them, shall be exercised. It surely does not say that no such assent shall be granted except in cases where the points in the streets to be crossed are precisely designated, or that provision for the location shall define precisely the line. The statute itself gives the consent of the State to the construction of such railroads across public highways and navigable streams, without defining the line of the road; and no reason is perceived why the city council may not select its own mode of granting like consent of the city in relation to streets, and also select its own mode of making provisions for the location of the railroad. The statute has not prescribed either the mode or the time in which either of these powers shall be exercised,—all that is obviously left to the judgment and discretion of the city council, in each case.

We seek in vain in the language of these statutes for any provision indicating that these powers can only be lawfully exercised on a line precisely defined. The legislature has not prescribed what shall be the limits of the consent of the city as to the crossing of the streets. Obviously that consent may be granted (if the city council think it wise to do so) without specifying the precise point at which the street shall be crossed. The same is true in relation to the exercise of the power "to provide for the location" of the railroad.

Under the old statute, and under the powers of the old charter, when no railroad corporation was allowed even to make a location of its track within a city without the consent of the common council, and when the city had the power "to direct and *control* the location of railroad tracks," it was never the practice of the city of Chicago, nor of any other city similarly situated, in making provision for the location of railroad tracks, or in giving its consent to the crossing and use of streets, to define precisely the line upon which such railroad track should be located and constructed.

No precedent has been brought to our attention of any provision for the location of any railroad, either by the act of the legislature (when special charters were granted) or by any ordinance enacted by any city upon the subject, wherein the precise line of the location of the road was defined in the ordinance or statute; and yet our statute books, and the city ordinances of our large cities, are full of provisions made for the location of railroads, and giving consent to railroad companies to use streets, and to cross them.

In the charter under which the Chicago and Rock Island Railroad was constructed is found the following: "The said company shall not be authorized to locate its track within the city of Chicago without the consent of the common council." Under that act, the common council, in May, 1851, passed an ordinance providing "that the Rock Island and Chicago Railroad Company may lay down *in* any one of the streets of said city, between the west line of State street and the west line of Halsted street, from the south line of said city as far north as the north line of Polk street, a single railroad track, with necessary turn-outs and turning-tables. Said company may extend said track northwardly as far as the south line of Van Buren street, *upon any street* between the west line of Clark street and the west line of Halsted street, and build all the necessary turn-outs and turning-tables. Said company may also construct in said city one or more railroad tracks, *within the boundaries* aforesaid, upon any land they may procure, by purchase or otherwise, and may also construct and use all depots which may be necessary to accommodate the business of said company." Under that ordinance the Rock Island railroad was brought into the city of Chicago nearly thirty years ago, its track constructed, and its depots erected. It has been in operation ever since, and we are not advised that its right to enter the city and condemn property therein for corporate purposes was ever questioned.

Without following out in detail the provisions of the several charters of the respective railroads, or the provisions of the several ordinances by which the railroads have been permitted to enter cities, it may be safely affirmed that in most cases the railroad company was not permitted to enter the city with its road, or to cross its streets, without the consent of the city authorities, and that in most cases, if not in every case, where the consent of a city has been granted, the ordinance granting the consent has made provision for the construction of the line within a defined district, and has omitted to define the precise line upon which the railroad should be constructed or the streets crossed.

Our attention has been called to many ordinances of the city of Chicago granting permission to railroads to enter the city, and to cross streets in Chicago. Among others, we find such ordinances relating to the Chicago, St. Charles and Mississippi Air-Line railroad, the Chicago and Canada Southern railroad, the Chicago and Illinois River railroad, the Chicago, Burlington and Quincy railroad, the Chicago and Pacific railroad, the Chicago and Evanston railroad, the Illinois and Wisconsin railroad, the Chicago and Great Eastern railway, and to the Fort Wayne and Chicago railway, and in every one of these cases the consent or permission to enter the city and to cross streets was granted to the railroad company by the city, *without defining* the *precise line* upon which the track should be located or on which the crossing should be made. In each case permission was given to cross the streets within a district defined in the ordinance. This mode of granting the consent or permitting railroads to enter cities under the former laws without defining the precise track, and by simply defining a district within which it might be located, was so universal that it must have been known to the General Assembly when the general Railroad act of 1872, and the general act in relation to cities and villages, in 1872, were enacted. Had it been intended

by the General Assembly to prohibit that mode of granting the license or permission in question by city councils, some language for that purpose would undoubtedly have been used, *more definite* than that found in either of those statutes.

We find no vital objection to this ordinance on the ground that the route of the railroad is not therein defined with more certainty.

It is insisted by appellees, that the permission to construct the road across streets at any point to be selected by the railroad company within a given district, is a delegation to the railroad company of powers which can only be exercised by the city council, and that the ordinance is therefore invalid. This does not seem to be so. The railroad company derives its power to locate its road from the act of the legislature, subject to such restraint as the city council may lawfully exercise under the provisions of the act in relation to cities. It is said by counsel for appellees, "the duty" of *locating* the route within the city, of each railroad, is *imposed* upon the city council by the City act. This is a misapprehension of the act. As already shown, to locate a railroad is one thing, and to make provision for its location is quite a different thing. The city council, by the City act, has power to make provision for the location, but as already suggested, the city has not the power to locate. That power is in the railroad company, subject to such provisions for the location as the city council may make. Again, the *power* to provide for the location of railroads is conferred upon the city council, but *the duty* of exercising that power in *all cases* is not imposed by law upon the city council. The law leaves to the discretion of the city council the question as to the cases in which the power shall be exercised, and the question as to what provision shall be made upon the subject in each case. Over this discretion the courts have no control.

It is next insisted, that this ordinance is void for want of a previous petition of the persons owning property fronting

on so much of the street as was proposed to be used in the construction of this road.   An examination of the ordinance will show that permission is granted to cross *only* the streets that intervene between the properties of the railroad company. No authority is granted in the ordinance to use any part of any street lying in front of the property of any other person. The consent to cross streets is limited by the terms of the ordinance to those parts of the streets *intervening* between property *acquired by the railroad company* for railroad purposes.   Neither of the complainants alleges that he owns property fronting on the proposed crossing of any street on the line.   The application of the railroad company to the city council for the passage of this ordinance seems to us to be, in substance, a petition by the owner of all the frontage, and is substantially a compliance with the terms of the statute in that regard, even if we assume that that provision has relation to the mere crossing of streets.   The City act provides, "the city council shall have no power to grant the use *of* or the right to lay down any railroad tracks *in* any street of the city,   *   *   *   except upon petition of the owners of the land representing more than one-half of the frontage of the street, or so much thereof as is sought to be used for railroad purposes."   In one sense, to permit a railroad company to lay down its track across a street, is undoubtedly granting "the use of" part of the street for railroad purposes, and is also granting "the right to lay down the railroad track *in* a street;" but in the connection in which these words are used in the 90th clause of the 62d section of the act in relation to cities and villages, it is plain that they have no reference to the mere crossing of streets by a railroad track.   In that section the words as to "the use of the street," and as to the laying down of railroad tracks "*in* the street," plainly have reference to the use of so great an amount of the street that the frontage upon the part used would have usually *several owners*; for the provision is, that such a grant shall not be

made "except upon the petition of *owners* representing one-half of the frontage, or so much thereof as is sought to be used for railroad purposes."

The General Assembly does not use the same language here as that used in the Railroad act. In that act it is said, no railroad shall be constructed "upon or across any street" without, etc. In the prohibition against granting the use of streets without a petition, etc., the thing designated is spoken of as "the use of" the street, or the right of laying a railroad track "*in* any street." The words "in any street" in the city charter, plainly mean the same as the "upon" any street, in the Railroad act. In the Railroad act it was thought necessary, in order to include the crossing of a street, to add the word "across" to the word "upon." The word "across" is not found in the phrase in question in the City act, in addition to the word "in," and this is because that clause has no reasonable application to the mere crossing of a street. Obviously, this clause has reference only to cases where the city may propose to grant the privilege to a railroad company to run along a street for a given distance. This clause has really no application to a case such as is presented in this record.

Again, it is insisted that the provision in the 7th section of this ordinance, that the permission granted in the ordinance is upon the condition that said railroad company "shall permit any other railroad company, not exceeding two in number, which have not at present any right of entrance into the city of Chicago under any existing ordinance, to use the said main railroad track herein authorized to be laid, *jointly* with the said Chicago and Western Indiana Railroad Company," is a delegation of the power of the city council, and operates to divest the city council of some of its chartered powers, and for that reason the ordinance is invalid. This position is not tenable. A railroad company having its track lawfully in operation to and into the city of Chicago, has a right, by law,

to lease the use of its track to any other railroad company, or to make running arrangements by which any other railroad company may run its cars upon the tracks of the railroad company owning the same; and the city council has no power to prohibit a railroad company having a track established and in use in a city, from permitting other railroad companies to run their cars upon the same. This provision, therefore, does not confer upon the railroad company any power whatever, nor does it deprive the city of any power whatever. Obviously, it is a burden imposed by the ordinance upon the railroad company, requiring that it shall furnish additional railroad facilities to the city of Chicago by consenting to make arrangements with such other railroad companies as are described in the ordinance for the joint use of their tracks.

This ordinance is characterized by counsel as one that is likely, if effective, to bring great injury upon the city of Chicago, and to produce evil to the public. That is not a question for the determination of this court. We find nothing on the face of the ordinance rendering it vicious, nor is it alleged in the bill that any injury to the public is to result from its passage.

We find no sufficient ground to question the validity of this ordinance.

The decree of the Superior Court must be reversed and the bill dismissed.

*Decree reversed.*

WALKER and SCHOLFIELD, JJ: We are unable to concur with the majority of the court in the decision of this case.

Subsequently, upon an application for a rehearing, the following additional opinion was filed:

Mr. JUSTICE DICKEY: Counsel for appellee have fallen into some very grave errors in the preparation of their petition for a rehearing.

It is first insisted that there is *no express* authority conferred by statute upon this railroad company to *locate* its

road.   This is a mistake.   Such a corporation is expressly required to define in its articles of association " the places from and to which it is intended to construct the proposed railway;" (clause 2d, sec. 3, ch. 114, Rev. Stat. 1874,) and is expressly "authorized to proceed to carry into effect the objects set forth in such articles, in accordance with the provisions of this [that] act." (Sec. 3, same chapter.)   By section 18 such corporation is expressly authorized to acquire title to any real estate required for right of way, by purchase or in any manner provided by any law of eminent domain; and by section 20 the power is expressly conferred upon such corporation "to cause such survey for its proposed railway to be made as may be necessary for the selection of the most advantageous route," and "to lay out its road," and "to construct the same." These provisions do not use the word "locate," but the words used mean the same thing. It is very plain that if the route be selected and laid out, and the road constructed thereon, the railroad will surely be located.   "*Qui hæret in literâ hæret in cortice.*"

Again, counsel say, in their petition, that "the provision of the act of 1849, prohibiting railroads from entering cities without the municipal consent, is *still* in *full* force and effect, *unrepealed* and *unmodified.*"   This is clearly an error.   Whatever may be thought of the proviso in the act of 1872 saving "all general laws,   *   *   *   so far as the same are not inconsistent" with the provisions of that act, that question is put at rest by the act of March 31, 1874, wherein that act of 1849 is *wholly* repealed, without any saving clause affecting the case at bar.   (See Rev. Stat. 1874, chap. 131, sec. 1, clause 135, pp. 1012–1017.)   This statute must have escaped the attention of counsel.

Again, counsel seem to have totally misapprehended the views of the court expressed in the opinion heretofore filed, upon another subject.   They say in their petition, "the argument of the opinion is, that the railroad company, and the

railroad company alone, has power to locate its route, whether within or without cities, and    \*    \*    \*    that this power given to city councils to provide for the location of the track is a power *simply* to consent to what it can *by no means* either *prohibit* or *interfere with.*" In other parts of the petition the idea presented is, that this court has, in substance, said that the power conferred upon the city council by the City act does not authorize such council to determine what the location within the city of a new railroad shall be, if at all. And again it is suggested, that this court has in this case decided that the statute gives to the city council *only* "a right to grant to the railroad company permission to do what the company, under the law, has power to do despite of the council." No such thought is expressed in the opinion, and none such can reasonably be implied from any expression it contains. On the contrary, it is therein expressly declared that the power of location conferred by the Railroad act upon the railroad company *must be exercised* by it, "*subject* to such provision as the city council may lawfully make." And again, in speaking of the freedom with which the railroad company may act in selecting and locating its route, the same is qualified by the words, "until some provision limiting the same is made by the city council." And again, the opinion says, "the railroad company derives its power to locate its road from the act of the legislature," (the Railroad act) "subject to such *restraints* as the city council may lawfully exercise under the provisions of the act in relation to cities." There is not one word in the opinion expressive of the idea that city councils have no power to control the location of railroad tracks within cities, and it is difficult to conceive how counsel of ability and intelligence could allow themselves to assume that the opinion so teaches. When counsel think fit to characterize unfavorably a given view of the law, they should not attribute such a view to the court, unless clearly justified by the language used in stating the grounds of

decision. Before assuming and insisting that the court has announced a palpably untenable proposition, it is certainly not unreasonable to expect of them a careful perusal of the whole of an opinion.

Some criticism is indulged in as to the use of the term "locate." We said: "The city council has no power to locate a railroad. * * * The power of the council is to provide for the location of the railroad by the railroad company, for by law no one other than the railroad company has the power of location," etc. It is obvious from the context (upon the most casual reading) that the word "locate" is here used in its primary sense,—meaning, to put in place. The council may direct what the location must be, if at all, but it is for the railroad company, in such case, to make the location or put the track in the place designated. If the railroad company do not choose to so locate their track, it is no function of the city to locate or put the track in place. This surely could mislead no one.

We find no ground for further consideration in this case. The application for rehearing is therefore denied.

*Rehearing denied.*